UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-20096
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

DERRICK ANTHONY THOMAS; RONALD HARMON;
ELLUARD J. JACKSON; THADDIUS
CHRISTOPHER GOINS, also known as
Cricket,

                              Defendants-Appellants.

_____

Appeals from the United States District Court for the
                Southern District of Texas
_____
                   August 19, 1997

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

    This direct criminal appeal involves four appellants who were
convicted of conspiracy to possess with intent to distribute
cocaine base and a substantive count of possession with intent to
distribute cocaine base.  The appellants make various challenges to
their convictions, including: alleged violations of the Fourth
Amendment, insufficient evidence to sustain their convictions, and
evidentiary error.   Goins  and  Jackson  also  challenge  their
sentences.  We affirm.

I.   PROCEDURAL HISTORY AND BACKGROUND

A grand jury charged Thaddius Christopher Goins (Goins), Derrick Anthony Thomas (Thomas), Ronald Harmon (Harmon), and Elluard Jackson (Jackson) with one count of conspiracy to possess with intent to distribute cocaine base and one count of possession with the intent to distribute cocaine base. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 and 18 U.S.C. § 2. Prior to trial, all four defendants moved to suppress all the evidence seized during a search of apartment #426 at 230 Uvalde in Houston. Specifically, the police discovered crack cocaine, drug paraphernalia, and a firearm in the apartment.

The district court held a hearing on the defendants' motions, and the following evidence was adduced. Based on a tip from a confidential informant that Goins would be manufacturing crack cocaine from powder cocaine, Houston police officers set up surveillance of the apartment at about 10 p.m. on May 4, 1995. Approximately an hour and a half later Harmon exited the apartment and began driving away in a white Cadillac. The officers stopped him because he was driving without his headlights and failed to signal. In response to police inquiries, Harmon denied having just left the apartment. Harmon was arrested, and a search of his person revealed a loaded firearm in his boot.

At approximately 12:50 a.m., Thomas left the apartment and was stopped by the police because the vehicle he was driving had outstanding warrants. The police arrested Thomas based on those warrants. Upon questioning, Thomas admitted there was "dope" in

2

the apartment but would not say how much. Thomas also gave the officers conflicting responses regarding whether he lived in the apartment. He told one officer that he had no involvement with the apartment, and he implied to another officer that it was his girlfriend's apartment. Further investigation after the search revealed that Thomas's name was on the apartment lease.

After Harmon's and Thomas's departures, Goins walked out of the apartment several times, glanced at his watch, and looked around the apartment complex, apparently awaiting the return of Harmon and Thomas, both of whom, unbeknownst to Goins, had been arrested. About 1:30 a.m., Goins walked across the street to use a pay phone outside a convenience store and was arrested on outstanding warrants. The police found $4,800 in cash on Goins's person. Additionally, when an officer asked Goins a question regarding the amount of "dope" in the apartment, Goins replied "Man, you already know what's up. Why you asking me? Why do you think I would know how much it is?"

The officers then decided to approach the apartment and try to obtain consent to search. Officers DeBlanc and Ong proceeded through an open gate of a privacy fence surrounding the apartment and knocked on the front door. Someone inside responded "come in," and DeBlanc knocked again and identified himself as a police officer. Ultimately, the individual who had bid the officers "come in" opened the door and walked away from the officers.[1] From their

---

[1] Jackson testified at the suppression hearing and offered a different version of the events. Jackson claimed the officers did not identify themselves and that they just crashed through the door

3

vantage point at the front door, the officers could see into the kitchen. Officer DeBlanc observed cocaine on the counter, a beaker, microwave ovens, and boxes of baking soda. At that point, Officer DeBlanc knew he had witnessed a drug offense. Upon entering the apartment Officer Ong conducted a protective sweep to ascertain whether there were armed individuals present. The officers saw Jackson seated in a chair in the living room, apparently feigning sleep.

The officers spoke with the man who had opened the door and discerned that he was mentally impaired and thus, could not give consent to search. Sometime after the search, it was learned that this man was Thomas's uncle. The officers then spoke to Jackson to try to obtain consent to search. Jackson told the officers he was left there to take care of the mentally impaired man. To avoid the appearance of coercion from the influx of police officers, the officers requested that Jackson continue the conversation in the bedroom. Jackson did not sign the consent to search form but did give oral consent to search. Jackson admitted that he said "Yeah, you already in, you might as well search." At the time, Jackson was unaware that the police taped part of the conversation. During this conversation, Officer DeBlanc observed an open duffel bag on the bed that contained crack cookies.

After Jackson orally consented, the officers searched the apartment. Aside from the cocaine and paraphernalia previously observed, the following items were seized: a semi-automatic pistol;

without being invited inside.

4

cocaine from a closet; crack cookies inside a jacket; and a plate in a bedroom with a razor blade. It was later determined that the bag in the bedroom contained nearly 3 kilograms of crack cocaine cookies.

After hearing the evidence, the district court made the following findings: there was an adequate basis to arrest Harmon based on the officer's testimony; neither Harmon nor Goins had standing to challenge the search of the apartment but Jackson and Thomas did have standing; the officers reasonably believed that Jackson, as a caretaker, had the limited authority to consent to a search of the common areas of the apartment but not to a search of the closets or underneath mattresses; the officers reasonably believed that the front door of the apartment was accessible to the public and that the uncle had consented for them to enter the apartment; and the officers could see the contraband on the counter top from the door. Based on these findings, the district court suppressed the evidence, including the semi-automatic pistol, discovered outside the common areas of the apartment and allowed the remaining evidence.

At trial, the Government introduced evidence that earlier on the day of the search, several officers set up surveillance of an auto detailing shop and observed an exchange between Goins, who had a white Cadillac, and another individual, who was driving a maroon Oldsmobile. Upon leaving in his Oldsmobile, the individual was stopped, and a little over $20,000 in cash and a semi-automatic pistol were recovered from hidden compartments in the vehicle.

5

The Government also introduced the evidence from the suppression hearing regarding the events that occurred during the officers' surveillance and subsequent search of the apartment on the night of May 4, 1995. The evidence seized from the apartment was introduced before the jury. Among other things, a scale, a metal pot, sixteen beakers, and the microwave ovens all contained small or trace amounts of crack cocaine. One beaker contained a cookie consisting of 24.6 grams of crack cocaine. The cookies found in the bag in the bedroom contained 2.9 kilograms of crack cocaine.

Officer DeBlanc testified that crack cocaine is made by mixing baking soda and water with the powder cocaine and heating the mixture on the stove or in the microwave. The cocaine then settles to the bottom of the container and the adulterants or diluents rise to the top. While still wet, the cookies are taken out of the beaker to dry. After an hour or so, they become extremely hard. It takes from 35 minutes to 1 hour to convert 1 kilogram of powder cocaine into crack. Officer DeBlanc also testified that a kilogram of cocaine costs between $17,000 and $21,000 wholesale. Street value of a kilogram of cocaine would be in excess of $100,000. He further testified that 2.9 kilograms of crack cocaine was an "incredibl[y] large amount of crack cocaine" and that it would take several individuals to cook that much cocaine because "[i]t's like an assembly type operation." In his opinion, the cookies found in the duffel bag had been freshly cooked.

A jury found all defendants guilty as charged, and the

district court imposed the following sentences: Goins, 380 months; Thomas, 292 months; Harmon, 292 months; and Jackson, 235 months.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Goins, Harmon, and Jackson contend that the evidence was insufficient to sustain their convictions. When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict. United States v. Salazar, 958 F.2d 1285, 1290-91 (5th Cir.), cert. denied, 506 U.S. 863, 113 S.Ct. 185 (1992). The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. United States v. Faulkner, 17 F.3d 745, 768 (5th Cir.), cert. denied, 513 U.S. 870, 115 S.Ct. 193 (1994).

To establish a conspiracy offense under 21 U.S.C. § 846, the Government must establish: "1) the existence of an agreement between two or more persons; 2) the defendant's knowledge of the agreement; and 3) the defendant's voluntary participation in the conspiracy." United States v. Brown, 29 F.3d 953, 958 (5th Cir.), cert. denied, 513 U.S. 1021, 115 S.Ct. 587 (1994). To sustain a

conviction for the possession of crack cocaine with intent to distribute, the Government must establish "the 1) knowing; 2) possession of a controlled substance; 3) with the intent to distribute it."  Id.

Goins, Harmon, and Jackson argue that the evidence demonstrated only their "mere presence" at the apartment, and thus, the evidence was insufficient to establish their knowing participation in either the conspiracy or the substantive offense.

We begin with examining the evidence implicating Goins.  On the day of the instant offense, several officers set up surveillance of an auto detailing shop and observed an exchange between Goins and another individual.  Upon leaving, the individual was stopped, and approximately $20,000 in cash and a semi-automatic pistol were recovered from hidden compartments in the vehicle.

Later that night, the officers began surveillance of Thomas's apartment.  After Harmon's and Thomas's departure, Goins walked out of the apartment several times and would glance at his watch and then look around the apartment complex, apparently awaiting the return of Harmon and Thomas, both of whom, unbeknownst to Goins, had been arrested.  Goins subsequently walked to a pay phone near the apartment and was arrested on outstanding warrants.  The police found $4,800 in cash on Goins's person.  Additionally, when an officer made inquiries regarding drugs in the apartment, Goins made an incriminating statement to the effect that because the police already knew of the drug activity, they need not ask him.

The above evidence, when examined in light of the cocaine and

drug paraphernalia found in the apartment, would allow the jury to conclude that Goins purchased one kilogram of cocaine from the unidentified individual at the detail shop[2] and brought it to Thomas's apartment to "cook" it. The evidence of Goins's actions after Harmon's and Thomas's departure would also allow the jury to conclude that Goins anxiously awaited their return. We are confident that the evidence of Goins's behavior, his incriminating statement to the police, and the evidence found on Goins's person and in the apartment demonstrate more than Goins's mere presence at the crime scene. The evidence is sufficient to prove beyond a reasonable doubt that Goins was a knowing member of the drug conspiracy and that he possessed with intent to distribute the cocaine found in the apartment.

As for Harmon, the evidence demonstrated that he was already in the apartment at the time the police began surveillance at 10:00 p.m., and he left about an hour and a half later. Harmon was then arrested, and a search of his person revealed a loaded handgun. Recognizing that for drug dealers, firearms are "tools of the trade," this Court has explained that possession of a gun is "highly probative in proving criminal intent." United States v. Martinez, 808 F.2d 1050, 1057 (5th Cir.), cert. denied, 481 U.S. 1032, 107 S.Ct. 1962 (1987). Also, when questioned by the officer, Harmon denied having just left the apartment; instead, he claimed that "he was just in the area riding around." This patently false

_____

[2]     The Government introduced evidence that one kilogram of cocaine costs $20,000.

9

statement is circumstantial evidence of Harmon's guilty knowledge. United States v. Richardson, 848 F.2d 509, 513 (5th Cir. 1988). Also, the evidence of Goins's behavior in awaiting Harmon's return implicates Harmon in the conspiracy. Viewed in the light most favorable to the Government, this evidence, together with the evidence regarding the amount of time and number of people involved in the cooking process, is sufficient to sustain Harmon's convictions.

Finally, we examine the evidence implicating Jackson. At the time the police entered the apartment Jackson was the only remaining responsible adult, and the water was "on" in the kitchen. The officers also noticed the "pungent" odor of the recently cooked cocaine and the cocaine and drug paraphernalia that was visible as soon as one entered the apartment. Additionally, Jackson never left the apartment during the time that the jury could infer the nearly three kilograms of crack cookies were being cooked. This evidence shows Jackson's knowledge of the crack laboratory and also indicates that the cooking process, which required several participants, was ongoing. As the Government points out, Jackson's codefendants left him alone in the apartment with a small fortune in cocaine. Although Jackson argues that he was merely present in the apartment, we have explained that "[t]he implicit rationale behind the `mere presence' argument is the theory that there may often be innocent parties who on occasion unwittingly associate with guilty parties at the scene of their criminal activity." United States v. Martinez-Moncivais, 14 F.3d 1030, 1034 (5th Cir.),

10

cert. denied, 513 U.S. 816, 115 S.Ct. 72 (1994). Here, the crime scene does not support Jackson's defense of unwitting association with his codefendants. Certainly, the jury was entitled to reject such a defense. The evidence was sufficient to sustain Jackson's convictions.

B. STANDING

Goins argues that the district court erred in finding that he did not have standing to challenge the warrantless search of the apartment. Goins has the burden of demonstrating that he has standing. United States v. Wilson, 36 F.3d 1298, 1302 (5th Cir. 1994). He must show (1) an actual, subjective expectation of privacy with respect to the place searched or things seized, and (2) that the expectation is such that society would recognize it as reasonable. Id. at 1302-03.

To make this showing, Goins relies on his presence in the apartment prior to his arrest and information from a confidential informant indicating that he had control over the apartment. The evidence established that Goins was present at the apartment prior to his arrest; however, contrary to Goins's assertion, the district court did not find that Goins had control over the apartment. Instead, the district court found that "the only information [from the confidential informant] that Officer Campbell had was that Mr. Goins was believed to be the custodian of the cocaine who was being allowed to use the apartment to process the cocaine." As such, Goins failed to make the requisite showing. The district court properly concluded that Goins lacked standing to challenge the

11

search of the apartment.

C.   CURTILAGE OF THE APARTMENT

Thomas and Jackson both argue that their Fourth Amendment rights were violated when the officers, without a warrant, entered through the gate of the privacy fence surrounding the apartment. We disagree.

The Fourth Amendment extends to protect the "curtilage" of a home from unconstitutional searches. United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139 (1987). The "curtilage" constitutes the area within which a person "reasonably may expect that the area in question should be treated as the home itself." Id. In determining whether an area outside the home is curtilage, we must consider four factors: the proximity of the area to the home, whether it is within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from outside observation. Id. at 301, 107 S.Ct. at 1139. The Supreme Court explained that these factors are not to be "mechanically applied;" instead they are helpful to the extent they shed light on the ultimate inquiry of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. at 301, 107 S.Ct. at 1140.

In the instant case, after hearing the evidence on the motion to suppress, the district court found that the gate was open when the officers entered the area. The court further found there was no indication "that [the gate] was meant to be used by any person

12

approaching that dwelling as . . . a place to which permission to enter had to be given. It was -- the gate was hanging open. There's no door bell there. There is no knocker there." "From the photographs and the testimony, it appears that there was -- it was certainly reasonable for the officers to believe the front door was readily accessible to the general public; and it was the principal means of access to the dwelling."

In regard to the first two factors, the proximity to the home and whether the area was within an enclosure surrounding the home, there was testimony that a fence surrounded the apartment and that it was approximately three feet away from the door of the apartment. Those two factors weigh in favor of the appellants. The next two factors, the nature of the uses to which the area is put and the steps taken by the resident to protect the area from outside observation, strongly indicate that the area is not curtilage. As found by the district court, the gate was left hanging open, and the resident had not taken any steps to indicate that the gate was an entry to a place that permission had to be given to enter. Because there is evidence to support those findings, they are not clearly erroneous.

Based on those findings, the district court properly concluded that the officers could reasonably believe that the gate provided the principal means of access to the apartment, through which they could approach the front door. See United States v. James, 40 F.3d 850, 862 (7th Cir. 1994), modified on other grounds, 79 F.3d 553 (7th Cir. 1996). Under these circumstances, the police did not

13

violate the Fourth Amendment by approaching the front door.

D.   CONSENT TO SEARCH

Thomas and Jackson challenge the validity of the consent obtained to enter and search the apartment.  They first argue that because the officers failed to identify themselves as police, they could not have reasonably believed that anyone opening the door was consenting to the police entering the apartment.  Contrary to the appellants' position, the district court credited the following testimony of Officer DeBlanc, who testified that he did announce "police" and that "after the first two knocks, each time a voice from the inside of the apartment told them to come in."  The court also credited Officer DeBlanc's testimony that, after the third knock, a person opened the door from the inside and immediately walked away, which provided the officers with a view of the contraband prior to entering the apartment.  Upon entering the apartment and speaking to the man who opened the door, the officers realized the man was not capable of giving proper consent for a search.  They then approached Jackson to request his consent to search the apartment.

The district court's decision to credit Officer DeBlanc's testimony over Jackson's was not clearly erroneous.  United States v. Bass, 10 F.3d 256 (5th Cir 1993).  Under the circumstances outlined above, we conclude that the officers reasonably believed that they had received consent to enter the apartment.

Thomas and Jackson next contend that Jackson did not have the authority to consent to a search of the apartment.  The district

14

court concluded that Jackson had apparent authority to consent to a search of the common areas of the apartment and found that:

> Mr. Jackson's testimony and the testimony of the officers is that he was simply there as a babysitter. As a babysitter, he would have a right of access to and of mutual use of the common areas, which would include, given his description of what he was charged with doing, the bedrooms, the bathrooms; but I don't see any basis that would enable me to say that he had the authority to consent to the insides of closets, underneath mattresses, or areas that would be beyond those areas in which an individual who is there as a babysitter would have a right of access.

> [I]t is the Court's conclusion that Mr. Jackson's ability to give consent -- apparent consent that the officers would have reasonably believed he had the authority to give would be an authority limited to the common areas and the bedroom areas of the apartment, the areas in which he testified he was permitted to use and was given free access to as a babysitter. I do not believe that it extends to a reasonable appearance of authority to search inside closets or underneath mattresses.

We agree that the officers reasonably relied on Jackson's apparent authority to consent to their search of the common areas of the apartment. See United States v. Jenkins, 46 F.3d 447, 458 (5th Cir. 1995).[3]

---

[3] In the court below, after the suppression hearing, the Government conceded that Thomas was arrested based on a nonexistent traffic warrant. The appellants contend that although the police knew that Thomas lived in the apartment, instead of asking for his consent to search, they obtained consent from the remaining persons in the apartment. Thomas and Jackson thus argue the officers could not have reasonably believed that the remaining occupants could validly consent to search.

Initially, it should be noted that the officers had conflicting information regarding whether Thomas lived in the apartment. One officer testified that Thomas denied any knowledge of the apartment when he was arrested. In any event, it is well established that valid consent may be obtained from a third party with joint access to and control of the property. United States v. Rizk, 842 F.2d 111, 112 (5th Cir.), cert. denied, 488 U.S. 832, 109 S.Ct. 90 (1988). Thus, Thomas and Jackson have not shown that the

Finally, after considering the relevant portion of the record, briefs and arguments of counsel, we find the remaining challenges to the search of the apartment to be without merit.

E.    SEARCH OF HARMON INCIDENT TO ARREST

Harmon challenges the district court's denial of his motion to suppress the evidence obtained as a result of a search incident to his arrest.  Specifically, he moved to suppress a statement he made to the police[4] and a pistol found in his boot.

The thrust of Harmon's argument is that the initial stop was illegal because driving in a private parking lot without headlights did not violate any Texas law.  Citing Texas statutes that provide the definition of the terms "highway" and "roadway," he contends that "[t]here was no justifying of a custodial arrest . . . for driving in the apartment parking lot with his parking lights on." This argument ignores that the district court found the testimony given by Officer Campbell to be credible.  Officer Campbell testified that he "saw [Harmon] go into the roadway without his lights on."  Officer Campbell further testified that Harmon failed to signal and was not wearing a seat belt.  The factual premise of Harmon's argument is incorrect.  Harmon therefore has failed to show that the stop was illegal.  Whren v. United States, __ U.S. __, 116 S.Ct. 1769 (1996) (traffic stop reasonable where probable cause to believe traffic code violated).  Further, a peace officer

_____

district court erred in concluding that the officers reasonably believed the remaining occupants could consent to search.

[4]    He denied that he had just left the apartment.

16

may arrest without a warrant if the officer observes the individual commit a traffic violation. Tex. Rev. Civ. Stat. Ann. art. 6701d, § 153 (Vernon 1977) (current version codified at Tex. Transp. Code Ann. § 543.001 (Vernon 1995)).[5] Once an officer makes such a valid arrest, the officer is entitled to conduct a search of the arrestee's person. Gustafson v. Florida, 414 U.S. 260, 266, 94 S.Ct. 488, 492 (1973).

Finally, Harmon argues that the arrest was pretextual. That argument is entirely without merit. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467 (1973) (explaining that arrest for traffic violation not rendered invalid because it was a pretext for a narcotics search). The district court properly denied Harmon's motion to suppress.

F.    ADMISSION OF EVIDENCE UNDER RULE 403

Goins argues that the district court erred in overruling his objection to the admission of evidence relating to the seizure of $20,000 in cash and a semi-automatic pistol from the maroon Oldsmobile that was stopped on the afternoon of May 4, 1995, after the driver was observed making an exchange with Goins. We are not persuaded that the probative value of this evidence was "substantially outweighed" by the risk of undue prejudice. Fed. R. Evid. 403. The district court therefore did not abuse its

_____

[5]    Harmon asserts that he "was arrested on the pistol." Officer DeBlanc testified that Harmon was arrested because "[h]e drove without his lights and there was some traffic violations and he was found in possession of a handgun." The district court credited Officer DeBlanc's account of the arrest, and this decision is not clearly erroneous. Accordingly, we assume that Harmon was arrested prior to the search that disclosed the weapon on his person.

17

discretion in allowing this evidence.  United States v. Morris, 79 F.3d 409, 411-12 (5th Cir. 1996).

G.    IMPROPER COMMENTS

In his final challenge to his convictions, Goins argues that the district court erred in failing to grant his request for a mistrial on two separate occasions.  He contends that both a comment made by defense counsel during cross-examination and certain improper remarks made by the Government during closing argument warranted the granting of a mistrial.[6]  Goins promptly objected to both the prosecutor's and defense counsel's challenged remarks, and the district court instructed the jury to disregard same.  We are satisfied that the instruction to disregard cured any error occasioned by the comments.  The district court did not abuse its discretion in denying Goins' motions for a mistrial.  See United States v. Limones, 8 F.3d 1004, 1007-08 (5th Cir. 1993), cert. denied, 511 U.S. 1033, 114 S.Ct. 1543 (1994).

F.    POSSESSION OF A DANGEROUS WEAPON UNDER § 2D1.1(b)(1)

Goins and Jackson argue that the district court erred in assessing them two points for possessing a dangerous weapon under § 2D1.1(b)(1).  This assessment should be given if the weapon was present, unless it is clearly improbable that the weapon was connected to the offense.  United States v. Sparks, 2 F.3d 574, 587

---

[6]    By adoption, Jackson attempts to raise these two claims. However, because it was Jackson's counsel who made the challenged comments during cross-examination, he is not entitled to raise that particular issue.  He is entitled to adopt the challenge to the Government's closing argument.  This latter claim is rejected for the same reason that we reject Goins' challenge.

18

(5th Cir. 1993) (citing § 2D1.1, comment. (n.3)), <u>cert. denied</u>, 510 U.S. 1056, 114 S.Ct. 720 (1994).

Both appellants argue that there is no evidence that they had knowledge of their codefendants' possession of weapons. "[S]entencing courts may hold a defendant accountable for a co-defendant's reasonably foreseeable possession of a firearm during the commission of a narcotics trafficking offense, pursuant to section 2D1.1(b)(1)." <u>United States v. Aguilera-Zapata</u>, 901 F.2d 1209, 1215 (5th Cir. 1990). If the Government establishes that another codefendant knowingly possessed a gun at the time "he and the defendant committed the offense by jointly engaging in concerted criminal activity involving a quantity of narcotics sufficient to support an inference of intent to distribute," then a sentencing court may infer that a defendant should have foreseen a codefendant's possession of a dangerous weapon. <u>Id</u>.

Here, the Government met its burden of demonstrating that, on May 4-5, 1995, the defendants were jointly engaged in the crime of possession with intent to distribute a very large amount of cocaine at the apartment. Jackson and Goins do not dispute that Harmon had possession of one weapon and another was found at the apartment. Thus, the sentencing court did not err in finding that it was reasonably foreseeable to Jackson and Goins that their codefendants would have possession of a dangerous weapon.

G.   AGGRAVATED ROLE IN THE OFFENSE UNDER § 3B1.1(c)

Goins argues that the district court erred in finding that he had an aggravated role in the offense under § 3B1.1(c). "If the

19

defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving less than five participants, a two level increase is warranted. U.S.S.G. § 3B1.1(c). We review such a factual finding for clear error. United States v. Giraldo, 111 F.3d 21 (5th Cir. 1997).

In view of the evidence before the district court regarding Goins's purchase of a large amount of cocaine in exchange for approximately $20,000 in cash, his behavior during the officers' surveillance of the apartment, and his attempt to contact Harmon by beeper after Harmon left the apartment[7] we are satisfied that the district court's finding that Goins was a manager or leader is not clearly erroneous.

H. ACCEPTANCE OF RESPONSIBILITY

Goins contends that the district court erroneously denied him a two-point reduction in his sentence for acceptance of responsibility. U.S.S.G. § 3E1.1(a). If a defendant "clearly demonstrates acceptance of responsibility for his offense," the sentencing guidelines instruct the district court to decrease the defendant's offense level by two points. U.S.S.G. § 3E1.1(a). Because of the district court's unique position to evaluate whether the defendant has demonstrated acceptance of responsibility, we

---

[7]    After Harmon and Thomas left the apartment (and unbeknownst to Goins) were arrested, Goins walked out of the apartment several times and looked anxiously towards the entrance of the complex, apparently awaiting the return of Harmon and Thomas. Using his cellular phone, Goins attempted to locate Harmon by calling Harmon's beeper. Also, at the time the officers arrested Goins, he had walked across the street to use a pay phone near the apartment.

20

review such a determination under a standard of review more deferential than that of clear error. United States v. Diaz, 39 F.3d 568, 571 (5th Cir. 1994). The defendant bears the burden of proving that he is entitled to a downward adjustment. United States v. Kinder, 946 F.2d 362, 367 (5th Cir. 1991), cert. denied, 503 U.S. 987, 112 S.Ct. 1677 & 2290 (1992).

To shoulder this burden, Goins relies on the inculpatory statement he made to the police upon his arrest. Although Goins's statement to the effect that he did not know the quantity of drugs in the apartment was incriminating, it is hardly a statement of contrition. Goins also contends that he should not be denied this reduction in sentence because he exercised his right to trial in order to preserve, among other things, the issue regarding the admissibility of his statement to the police.[8] Goins correctly contends that he should not be denied the reduction simply because he exercised his right to a trial by jury. United States v Siebe, 58 F.3d 161, 163 (5th Cir. 1995). The record reveals that that is not what happened. At sentencing, the district court expressly recognized the commentary to § 3E1.1 that provides that a defendant who goes to trial may be accorded a reduction for his acceptance of responsibility. § 3E1.1, comment. (n.2). Reading from that commentary, the district court further recognized that "in each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pretrial

---

[8] Of course, as the Government points out, Goins does not challenge on appeal the admission of his statement to the police.

21

statements and conduct." The district court then found that there had been no pretrial statements of acceptance of responsibility.[9] See United States v. Diaz, 39 F.3d 568, 572 (5th Cir. 1994) (timeliness is properly taken into consideration to determine whether defendant accepted responsibility). Goins has not shown that the district court's conclusion that Goins had not accepted responsibility was clearly erroneous.

I.   REFUSAL TO DEPARTURE DOWNWARD

Goins argues that the district court erred in failing to grant a downward departure under § 5K2.0, based on the fact that the Sentencing Commission did not take into consideration the racially discriminatory effect of the application of the sentencing guidelines regarding cocaine base or "crack." Because this Court recently rejected this argument, Goins is precluded from prevailing on this claim. United States v. Fonts, 95 F.3d 372, 374 (5th Cir. 1996).

For the above reasons, the convictions and sentences of the four appellants are AFFIRMED.

---

[9]   Although Goins does not refer to it on appeal, he apparently wrote the court a letter in an attempt to demonstrate his acceptance of responsibility after he had been convicted.

22