REVISED - JUNE 29, 1998

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-60796

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

MARK SYLVESTER, LEON BROWN, and WILLIE EARL CULLEY,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

June 11, 1998



Before GARWOOD, SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


Mark Sylvester, Leon Brown, and Willie Culley appeal their convictions and, in Brown's case, the sentence, for assorted drug-related crimes. We remand for a hearing on their jury tampering claim and reject the remainder of their challenges.


I.

A.

Culley ran an automotive shop in Jackson, Mississippi. Following a lengthy investigation, the government concluded that he also presided over a cocaine distribution network that bought the drug in Houston and sold it in Jackson. Brown, the government charged, was one of Culley's couriers who often accompanied Culley on his trips to Houston to purchase cocaine. Sylvester worked at Culley Automotive and allegedly supplemented his income by dealing cocaine on the side.

B.

The three appellants and eleven others were charged in a thirty-eight-count indictment with sundry drug-related offenses.[1] Count 1 charged all three with conspiracy to possess with intent to distribute, conspiracy to distribute, and conspiracy to use a communications facility (the telephone) in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 846.[2] Count 2 charged Culley with engaging in a continuing criminal enterprise under 21 U.S.C. § 848. Counts 3 through 38 alleged specific dates and times that the appellants used a telephone to facilitate the conspiracy to possess with intent to distribute, in violation of 21 U.S.C. § 843(b).

---

[1] The eleven other defendants were never tried. Some entered into plea bargain agreements with the government; the charges against the others were dismissed.

[2] The special verdict form asked the jury to find whether each defendant conspired to possess with intent to distribute cocaine and/or crack, conspired to distribute cocaine and/or crack, and conspired to use a communications facility in furtherance of a drug trafficking crime.

Culley, Brown and Sylvester were tried together. The government's evidence fell into two main categories. First was the testimony of six fact witnesses, some of whom were plea-bargaining co-conspirators. Second was a series of taped phone conversations intercepted from the phone at Culley Automotive and from Culley's personal cellular phone; in all, the government taped nearly two hundred calls over a month-long period. During the recorded conversations, the appellants never used the words "cocaine" or "crack," but spoke, the government claimed, in code. The appellants did not testify, and only Culley chose to call witnesses.

The jury found Culley guilty of conspiracy to distribute cocaine and to use a communications facility in furtherance of a drug trafficking crime (count 1); of participating in a continuing criminal enterprise (count 2); and of seventeen of the remaining thirty-six counts for using the phone in furtherance of the conspiracy. The jury found Brown guilty of conspiracy to distribute crack cocaine (count 1) and Sylvester guilty of two uses of the phone in furtherance of the conspiracy.

II.

Five issues are before us. First, all three appellants claim that the district court erred in issuing supplemental instructions to the jury during deliberations. Second, Culley and Brown argue that a witness's remark constituted an impermissible comment on their failure to testify. Third, Culley and Brown contend that

3

their convictions were not supported by the evidence. Fourth, Brown claims that the district court erred in sentencing him. And fifth, Culley and Brown argue that the district court erred in meeting *ex parte* with individual jurors to discuss possible jury tampering.

## A.

The appellants claim that the district court erred in issuing supplemental instructions to the jury. They lodge two specific complaints: that the court should have, but did not, notify and consult with them in advance; and that the content of the instructions was faulty. "When evaluating the adequacy of supplemental jury instructions, we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it." *United States v. Stevens*, 38 F.3d 167, 170 (5th Cir. 1994).

The supplemental instructions were issued after the district court received a note from the jury, which began deliberating at 4:45 p.m. At 7:23 p.m., it sent the following note: "We cannot agree SS Some members will never vote guilty because there is no physical evidence and the word cocaine is never used in the conversations." The court called the jury back to the courtroom but did not notify either side that he had received the note, nor did he warn them that he would be issuing supplemental instructions. He re-read portions of the prior charges concerning

4

the elements of each offense and the definitions of key terms, then

added this supplemental instruction:

> Now, none of the charges, neither Count 1, nor Count 2, nor Count 3 requires the Government to provide physical evidence, although it may be helpful to you in weighing the Government's case.  If you are satisfied by proof beyond a reasonable doubt that the alleged conversations, that the alleged conduct of the defendants amount to a conspiracy, that is, an unlawful agreement as charged in Count 1, thenSSor excuse meSSor if you are persuaded by proof beyond a reasonable doubt that the alleged conversations, the alleged conduct of the defendants amount to the violation of the use of a communication facility as charged in Counts 3 through 38, or if you are persuaded by proof beyond a reasonable doubt that the alleged communications and alleged conduct of Defendant Culley of Count 2 persuades you by reasonable doubt that he violated Count 2, then if you are so persuaded by proof beyond a reasonable doubt with respect to the conversations and conduct, then the Government has proved its case.  And then you will find the defendants guilty. If you are not persuaded, then you will find the defendants not guilty.
>
> Finally, the Government's evidence need not show that any defendant ever used the word cocaine if you are satisfied by proof beyond a reasonable doubt that the defendants engaged in coded conversations using substitute words for cocaine instead of the expressed word itself.  Your inquiry lies further than determining only what the defendants said.  You must determine what they meant by using the words they did.
>
> Now, remember, as the triers of the facts, you, the jury, are tasked with determining the facts here.  Whether the Government has proved any of the defendants guilty by proof beyond a reasonable doubt.  You may now retire and continue your deliberations.  All rise.

The jury returned its mixed verdict at 12:15 a.m.  Although

defense attorneys were present when the court issued the

supplemental instructions, they argue that the court should have

notified themSSand allowed them inputSSbefore speaking to the jury.

1.

The appellants argue that the supplemental instruction constituted an *Allen* charge. We note at the outset that if the instruction *was* in fact an *Allen* charge, the court was under no duty to notify counsel of its intention to issue it; ensuring defense counsel's presence when the charge is read is enough. In *United States v. Bright*, 588 F.2d 504, 510 (5th Cir. 1979), we held that "a trial judge is not required to notify defense counsel of his plan to use [an *Allen* charge]. If a defendant's attorney is present when the instructions are actually read to the jury and is afforded the opportunity to object, that is sufficient."

Emphasizing the first three words of the jury's noteSS"we cannot agree"SSthe appellants claim that the judge's response to this supposed deadlock was error because it did not include the content required of *Allen* charges, namely an instruction that each juror should adhere to his own honest opinion. *Allen* charges are creatures of nuance that we have approved under limited circumstances. In *United States v. Bass*, 490 F.2d 846, 854 (5th Cir. 1974), *overruled on other grounds*, *United States v. Lyons*, 731 F.2d 243 (5th Cir. 1984) (en banc), we observed that "[t]his court has tolerated *Allen* charges so long as the charge makes plain to the jury that each member of the jury has a duty conscientiously to adhere to his own honest opinion and so long as the charge avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial."

While we agree with the appellants that the supplemental

6

instruction was deficient as an *Allen* charge, we do not agree that it *was* an *Allen* charge. Although the jury's note opened with "[w]e cannot agree," the instruction focused on the legal issues raised in the second half of the note rather than on the possible deadlock. *Allen* charges concern the jury's duty to make good faith efforts to reach a verdict; while the note *could* have been answered by an *Allen* charge, the court instead responded through a supplemental instruction aimed at dispelling the legal confusion implicit in the jury's message. In sum, the jury's note invited two possible responses: an *Allen* charge or a clarifying instruction on the law. The court chose the latter.

2.

Our refusal to characterize the supplemental instruction as an *Allen* charge does not sink the appellants' argument. In fact, it strengthens their claim in one important respect: Whereas we have been unwilling to require notification of defense counsel before an *Allen* charge is issued, we are less forgiving with regard to the court's answering legal questions submitted by a deliberating jury.

The court's duty to consult with counsel upon receiving questions from the jury was recognized in *Gomila v. United States*, 146 F.2d 372 (5th Cir. 1944), in which the court answered the jury's questions without sharing them with, or consulting with, defense attorneys. We held that "[d]efendants were entitled to be apprised of the nature of these questions and were entitled to an opportunity to be heard in connection therewith." *Id*. at 373.

7

The Supreme Court bolstered this conclusion in *Rogers v. United States*, 422 U.S. 35 (1975), in which the trial judge received and answered a legal question from the jury without notifying counsel. The Court concluded that this was error, relying on FED. R. CRIM. P. 43, which guarantees defendants the right to be present at every stage of the trial. The Court interpreted this right as including not only the right to be physically present, but also the right to be notified:

> Cases interpreting the Rule make it clear, if our decisions prior to the promulgation of the Rule left any doubt, that the jury's message should have been answered in open court and that petitioner's counsel should have been given an opportunity to be heard before the trial judge responded.

*Id*. at 39.

We relied, as well, on *Rogers* in *United States v. McDuffie*, 542 F.2d 236 (5th Cir. 1976), in which the court did not disclose the jury's question to counsel before answering it. Labeling the procedure "well established," we explained that "[w]hen a communication is received from the jury, counsel should be informed of its substance and afforded an opportunity to be heard before a supplemental charge is given." *Id*. at 241. The purpose of this procedure is to enable counsel to make informed decisions concerning whether to object or propose additional instructions. Granting counsel the opportunity to object only *after* the supplemental instruction has been delivered is too little, too late. *Id*.

Accordingly, we conclude that the district court erred by failing to notify counsel before issuing the supplemental

8

instruction.  Upon receiving the note from the jury, the court should have notified counsel of the message, shared its contents, and granted each side the opportunity to be heard.

3.

We must now determine whether this failure to notify constitutes reversible or merely harmless error.  In *McDuffie*, we said that failure to notify was harmless when "the supplemental charge was distinctly responsive to the question and correctly stated the law."  542 F.2d at 241.  Similarly, in *United States v. Breedlove*, 576 F.2d 57, 60 (5th Cir. 1978), we deemed such a mistake harmless, concluding that while "[w]e by no means approve this unjustified jury-court communication," when "the Judge's answer to the jury's inquiry was distinctly responsive to the question, it clearly stated the law, and no prejudice is shown, the error is harmless."

Here, the appellants do not claim that the court failed to respond to the jury's question or misstated the law.  Instead, they argue that prejudice arose from the failure to re-read other portions of the initial instructions that were more favorable to the defense.  Because the court did not "balance" the supplemental instructions in this way, the appellants claim, their theory of the case was torpedoed and the jury coerced into returning a guilty verdict.

We do not agree that the appellants were prejudiced by the supplemental instruction.  The court simply answeredSSby all

9

accounts, accurately—the question presented by the jury's note: whether the government was required to introduce physical evidence or show that the defendants used the word "cocaine." The appellants do not cite any authority suggesting a duty to dilute—a duty to temper instructions defense counsel deems unfavorable by issuing supplemental instructions to questions that were not even raised.

Moreover, the court explained that the supplemental instructions were just that—supplemental—and should be considered in tandem with the original instructions. The court instructed as follows: "You should consider what I just read to you along with what I read to you earlier. This is essentially part of the earlier group of instructions. And you should apply all of them during your deliberations." The court thus made sufficiently plain that the initial instructions remained valid; it was not obliged, as the appellants suggest, to repeat them to the jury. Finally, we note that the jury did not return a verdict until 12:15 a.m.—over four hours later. This lag further undercuts the appellants' claim that the jury was coerced by the supplemental instructions.

In sum, the appellants have not shown prejudice or coercion or that the instructions misstated the law or were unresponsive to the jury's note. Accordingly, any error was harmless.[3]

B.

---

[3] In so deciding, we reiterate, however, that the proper course is to ensure all counsel's participation in the proceedings.

Culley and Brown argue that a witness's remark constituted an impermissible comment on their election not to testify. They aver that their motion for a mistrial on this basis was improperly denied. The denial of mistrial is reviewed for abuse of discretion. *United States v. Thomas*, 120 F.3d 564, 573-74 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 721 (1998).

Jessie Stewart was a government witness who had been implicated in the drug conspiracy and had struck a plea bargain under which she agreed to testify against the appellants. During cross-examination by Culley's attorney, the following exchange occurred:

> Q:  But you wouldn't disagree with me that anybody faced with as many charges [as] you have would get in here and try to work out something the best they could which you've obviously done and then get in here and testify to something that would help them; isn't that true?
>
> A:  Under the advise [*sic*] of my lawyer my telling the truth would help me more than me sitting on that row over there and not telling the truth.

Culley and Brown claim that Stewart's remark was aimed at them and prejudiced the jury by castigating their failure to take the stand.

As an initial matter, it is far from evident how the jury could interpret the remark as referring to the appellants' choice not to testify, given that the remark occurred during the government's case-in-chiefSSwell before the appellants had the opportunity to take the stand. But even assuming that the comment stuck in the jury's collective craw until the appellants' failure to testify became apparent, we do not see how this remark warrants a mistrial.

11

The Fifth Amendment prohibits a witness from commenting on a defendant's failure to testify in a criminal trial. *Griffin v. California*, 380 U.S. 609 (1965). We have set a high threshold for reversible error, however. "Comment on a defendant's silence is reason for reversal only if the speaker's manifest intention is to focus on that silence or the remark was such that a juror would naturally and necessarily take it as a comment on the defendant's failure to testify." *United States v. Garcia*, 655 F.2d 59, 64 (5th Cir. Unit B Sept. 1981). Moreover, the comment must have a "clear effect" on the jury before reversal is warranted. *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990).

Here, neither prong of *Garcia* is fulfilled. Stewart did not demonstrate a "manifest intention" to "focus on the silence" of the appellants. To the contrary, as the court concluded, her remark was meant to defend her integrity in the face of questions suggesting that she was fabricating her testimony. Even if we agreed that her opaque remark could be construed as referring to the appellants' failure to take the stand, there is no evidence that her *intention* was to focus on their silence, nor would a juror "naturally and necessarily" interpret her statement that way.

In short, we do not agree that this enigmatic exchangeSSoccurring before the jury knew the appellants would not testifySShad the "clear effect" of prejudicing the jury. The district court did not abuse its discretion in denying a mistrial.

C.

12

Culley and Brown claim the evidence was insufficient to support their convictions. When reviewing a challenge to the sufficiency of the evidence, we must determine whether a rational trier of fact could have found guilt beyond a reasonable doubt. *United States v. Ivey*, 949 F.2d 759, 766 (5th Cir. 1991). In so doing, we view all evidence, including any inferences that may be drawn from it, in the light most favorable to the government. *Id*.

1.

Culley was convicted of conspiracy under count 1, with a special finding that he conspired to distribute powder cocaine and conspired to use a communications facility in furtherance of a drug trafficking crime; he also was convicted of engaging in a continuing criminal enterprise ("CCE") under count 2. Pursuant to *Rutledge v. United States*, 517 U.S. 292 (1996), the government agreed to dismissal of the count 1 conviction at sentencing.

Culley challenges the CCE conviction by arguing that he was convicted of a conspiracy to distribute cocaine *powder*, whereas Brown was convicted of a conspiracy to distribute *crack* cocaine. Therefore, Culley says, this could not have been the same conspiracy, and in the absence of a co-conspirator, his conviction must be reversed.

Even if we accept Culley's dubious distinction, his conviction is valid under *United States v. Zuniga-Salinas*, 952 F.2d 876, 878 (5th Cir. 1992) (en banc), holding that an inconsistent verdict is not a bar to conviction even where all other co-conspirators are

13

acquitted.  Accordingly, Brown's acquittal on charges of conspiring to distribute cocaine powder does not automatically vacate Culley's conviction on the same charge.

The indictment named a group of conspirators (not all of whom were indicted), and the evidence supported the existence of a conspiracy.  The government introduced eyewitness testimony in addition to the hours of taped conversations between Culley and his dealers, runners, and assorted henchmen.  Viewed in the light most favorable to the government, the evidence established Culley's guilt beyond a reasonable doubt.  Even if he is deemed not to have conspired with Brown, the evidence supported a finding that he conspired with other individuals named in the indictment.

2.

Brown challenges the sufficiency of the evidence supporting his conviction for conspiracy to distribute crack cocaine.  He says that the main witness linking him to the crack-dealing conspiracy was one Edward Bennett, whom Brown attacks as not credible because he is a convicted felon and drug addict.  Brown adds that even if we find Bennett's testimony credible, it failed to establish the existence of a conspiracy.

Bennett's credibilitySSlike that of any witnessSSis properly a question for the jury.  The real issue is whether his testimony, coupled with any other evidence, sufficed to support Brown's conviction when viewed in the light most favorable to the government.

14

The evidence was sufficient. Bennett testified that he cooked powder cocaine into crack for Brown; Sylvester Jobe testified that he bought crack from Brown. Such testimony, viewed in the light most favorable to the government, supports a jury finding that Brown conspired to distribute crack cocaine.

D.

Brown challenges his sentence, arguing that the district court relied on two erroneous factual findings in applying the sentencing guidelines. Specifically, he claims that the court wrongly concluded he was a manager or supervisor of the drug conspiracy and wrongly found him responsible for 1.48 kilograms of crack cocaine. We review factual findings for clear error, and the application of the guidelines *de novo*. *United States v. Claiborne*, 132 F.3d 253, 254 (5th Cir.), *cert. denied*, 66 U.S.L.W. 3758 (U.S. May 26, 1998) (No. 97-8827).

Brown received a three-point increase in his offense level pursuant to U.S.S.G. § 3B1.1(b) because the district court concluded that he was a manager or supervisor. The court relied on Bennett's testimony that he cooked crack for Brown; the court also noted the testimony of "Handy" Moore, who testified to Brown's role in the distribution scheme.

Brown attempts to discount this evidence by pointing out that Bennett, although he admitted cooking crack for Brown, never directly said that Brown "managed" him; in this sense, Brown was merely a bystander or at worst a *sous-chef*, but not a manager or

15

supervisor.  This claim fails for the same reason as Brown's challenge to the sufficiency of the evidence:  Given Bennett's testimony that he cooked crack at Brown's request, coupled with "Handy" Moore's testimony about Brown's role, the  conclusion that Brown was a manager or supervisor cannot be deemed clearly erroneous.

Brown asserts that the court erred in finding him responsible for 1.48 kilograms of crack cocaine.  The court calculated this figure by including a one-kilogram purchase of what Brown and his friends believed was cocaine.  (Unhappily, it turned out to be wax.)  Brown complains that the court wrongly measured the wax as cocaine base instead of cocaine powder, resulting in a more severe sentence.  He says that because Culley usually bought cocaine in powder form, the court erred in concluding that the appellants thought they were purchasing cocaine in base form.

The court premised its finding on testimony that Brown believed he was buying cocaine in base form.  Even Brown, in his brief, concedes that the precise nature of the anticipated purchase was ambiguous.  In light of Brown's history as established at trialSSHe sold crack cocaine and had it cooked for himSSthe district court's conclusion, bolstered by testimony illuminating Brown's intent, cannot be characterized as clearly erroneous.

E.

The appellants' most persuasive contention is that the district court erred by conducting *ex parte* voir dire with

individual jurors during its investigation of jury tampering. We review for abuse of discretion a district court's handling of complaints of outside influence on the jury. *United States v. Sotelo*, 97 F.3d 782, 794 (5th Cir. 1996).

1.

There were three separate instances of potential jury tampering. The first involved juror Glen Mallett, who received a call at home around 9:00 p.m. from an unknown man who said, "I've got to talk to you about tomorrow." Mallett said he could not discuss the trial and hung up.

Caller ID revealed that the call was placed from a pay phone less than a mile away. Fearful for his safety, Mallett and his wife left his house and spent the night at the home of his mother-in-law. He later learned that a second call was placed to his home that night at 2:30 a.m. from the same number.

The second instance of potential tampering involved juror Rodney Caston, an employee of United Parcel Service ("UPS"). Caston received a call at home from a man identifying himself as "Ervin," who told Caston that he knew who he was and that he worked for UPS. Ervin tried unsuccessfully to get Caston to discuss the case. Later that night, Caston received another call from a man claiming to be a relative of Ervin's.

At 9:30 that night, a stranger bearing a mysterious package appeared at Caston's home. Caston was away; the visitor asked Mrs. Caston to deliver the package to her husband, but she refused to do

17

so, and the man left.  Caston told the district court that he believed the man worked at Culley Automotive.[4]

After hearing Caston's story§§and learning that he had repeated the tale to other jurors§§the district judge met *ex parte* with each member of the jury and questioned them about what they had heard and whether they could remain impartial.  Two other jurors mentioned that they had heard about the Caston incident.  During the meeting with juror Maria Thompson, she raised a third instance of potential tampering, reporting that a concession stand vendor at the courthouse had implored juror Mallett to "take it easy on the brothers."

Neither defense counsel nor the government was present during these meetings or had been notified of the alleged tampering or the voir dire.  After finishing his questioning, the judge determined that the improper contacts had not resulted in prejudice and allowed all jurors to continue to serve.  The judge then notified the parties, summarizing the tampering incidents and explaining that he had conducted voir dire in chambers.  He told defense counsel that he would make available transcripts of the voir dire after the trial.

The defendants' motion for a mistrial was denied, and they were not permitted to submit supplemental questions to the jurors.  The judge explained that "these are matters which solely concern the Court."

---

[4] The saga of the Ervins resulted in a federal conviction for jury tampering.

2.

The Supreme Court explained the proper procedure for handling investigations of jury tampering in *Remmer v. United States*, 347 U.S. 227 (1954). There, a juror was approached by a third party offering a bribe in exchange for a favorable verdict. The juror declined the offer, met *ex parte* with the trial judge, and was later interviewed by the F.B.I. The judge concluded that the juror was unbiased, and the defendant was convicted. The Court vacated the conviction, holding that a trial court should not take final action *ex parte*, but "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, *in a hearing with all interested parties permitted to participate*." *Id*. at 229-30 (emphasis added).

We have consistently required the inclusion of all parties in jury tampering hearings. For example, in *United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984), we noted that when the possibility of outside influence on the jury arises, "[t]he failure to hold a hearing in such a situation constitutes an abuse of discretion and is reversible error." *Accord United States v. Denman*, 100 F.3d 399, 405 (5th Cir. 1996). *Remmer* and its applications in this Circuit thus require a district judge, when confronted with credible allegations of jury tampering, to notify counsel for both sides and hold a hearing with all parties participating.[5]

---

[5] We do not mean to suggest that a district court is obligated to conduct a full-blown evidentiary hearing every time an allegation of jury tampering is

(continued...)

19

The government deploys two arguments, neither of which is persuasive, in hopes of justifying the *ex parte* nature of the hearings. First, it contends that the court was not required to notify or include the defense under *Webster*. There, we held that the judge did not err when he excluded counsel from a hearing to investigate juror misconduct.

The government's argument is suspect, because the *Webster* court explicitly distinguished between juror *misconduct* cases and jury *tampering* cases, remarking that "[w]e are not convinced that the premature expression of an opinion about the merits of a case [i.e., juror misconduct] rises to the level of . . . jury tampering." 750 F.2d at 338-39. Accordingly, the court concluded, an *ex parte* hearing may be appropriate in juror misconduct cases, but not in jury tampering cases. The court thus maintained the very distinction the government argues it erased, concludingSSin language that directly contradicts the government's positionSS"Counsel should be present at any hearing held to assess outside influence on the jury." *Id*. at 338.

Next, the government contends that the court "conducted the necessary inquiry with such skill that it deflected all possible prejudice from the defendants." The government does not cite any caselaw for this novel proposition. Having reviewed the

(...continued)
raised. As we said in *United States v. Chiantese*, 582 F.2d 974, 980 (5th Cir. 1978), "the court must balance the probable harm resulting from the emphasis [a hearing] would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct." Here we think it indisputable that the outside contacts with the jurors were of a serious enough magnitude to warrant a hearing.

20

transcripts of the voir dire, we agree that the court conducted a thorough investigation of the tampering incidents. Even the most diligent *ex parte* inquiry is insufficient, however, under *Remmer*, which requires that counsel for both sides have the opportunity to examine jurors. The government has cited no authority suggesting that we should read *Remmer* any differently.[6]

3.

We do not, however, agree with appellants' claim that the government is automatically required to prove the absence of prejudice. The *Remmer* Court held that any outside influence on the jury was presumptively prejudicial; the burden fell on the government to rebut this presumption.[7] Yet, in recent years the

_____

[6] The government adds that defense counsel could not have been invited to a hearing, because their clients were suspects in the tampering, and the court's investigation would have been impeded by alerting the lawyers. Again, the government cites no authority.

Although we are troubled by the possibility that, if the contacts were in fact instigated by the appellants, they are profiting from their own wrongdoing, this argument is expressly foreclosed by our caselaw. *See United States v. Forrest*, 620 F.2d 446, 458 (5th Cir. 1980) ("It makes no difference in this case that it was [the defendant] himself who initiated the contact that may have poisoned the jury. We reject the suggestion that [the defendant] may not be heard here to complain of the results of his own misconduct."). This rule, while called into question as applied to civil cases, remains valid in the criminal context. *Cf. Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1147 (5th Cir. 1988), *vacated on other grounds*, 492 U.S. 914 (1989) ("Even if we were not convinced that the district court correctly found an absence of jury prejudice here, we would not permit the perpetrator of jury tampering, in a civil proceeding, to reap the rewards of his misdeed by enjoying a new trial."). In any event, in the instant case, the government does not allege that the contacts were initiated by any of the appellants.

[7] *See Remmer*, 347 U.S. at 229:

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to

(continued...)

Supreme CourtSSand at least two of our sister circuitsSShave backed away from this position, indicating that the presumption of prejudice and the assignment of the burden of proof are not triggered automatically but are imposed at the discretion of the district court.

The first modification of *Remmer* occurred in *Smith v. Phillips*, 455 U.S. 209 (1982). There, both the district court and the court of appeals concluded that a habeas petitioner was entitled to a new trial based on the alleged partiality of a juror who had applied for a job in the prosecutor's office. Although the trial court had conducted a hearing and determined that the juror was not prejudiced, the federal courts concluded that the trial court should have conclusively presumed prejudice, given the facts. 455 U.S. at 214. The Supreme Court, citing *Remmer* as authority, reversed, holding that due process requires only that the trial court hold a hearing to determine the existence of prejudice. It concluded: "This Court has long held that the remedy for allegations of juror partiality is a hearing in which the *defendant* has the opportunity to prove actual bias." 455 U.S. at 215 (emphasis added). This language is difficult to reconcile with a presumption of prejudice warranting rebuttal by the government.[8]

---

(...continued)
    establish, after notice to and hearing of the defendant, that such
    contact with the juror was harmless to the defendant.

[8] The court in *United States v. Pennell*, 737 F.2d 521 (6th Cir. 1984), read *Phillips* as abolishing *Remmer*'s presumption of prejudice and shifting the burden of proof from the government to the defendant. The court construed *Remmer* as speaking only to the proper *procedure* a court should follow when confronted with
(continued...)

In *Abell*, we recognized that *Phillips* "cast a foreboding shadow" on the *Remmer* presumption, but left the question unresolved, noting only that "we have not yet explicitly determined how *Smith v. Phillips* has affected *Remmer*." *Id*. at 1146.[9] Similarly, in *Young v. Herring*, 938 F.2d 543, 558 n.7 (5th Cir. 1991) (on remand), although not deciding the question, we observed that *Phillips* "clarified" *Remmer*. We suggested that *Remmer* did not establish a flat rule of presumptive prejudice, but was rather a "characteriz[ation]" made "out of deference to the seriousness of the conduct." *Id*.

The Supreme Court once again called into doubt the *Remmer* presumption in *United States v. Olano*, 507 U.S. 725 (1993). There, the defendant claimed prejudice when the trial court permitted alternate jurors to sit in on deliberations, but instructed them not to participate. The Court summarized what it termed its "intrusion jurisprudence," quoted *Phillips*, and concluded:

> There *may* be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?

*Id*. at 739 (emphasis added and internal citations omitted).

At least one other court has understood *Olano* as reconfiguring

---

(...continued)
credible allegations of jury tampering. 737 F.2d at 532. *Pennell* was not followed by all circuits, however. *See, e.g., United States v. Littlefield*, 752 F.2d 1429, 1431-32 (9th Cir. 1985).

[9] We also concluded that *Webster*, 750 F.2d at 336-39, did not resolve the question because, among other things, it failed to take account of *Phillips*. *Abell*, 858 F.2d at 1146.

*Remmer*. In *United States v. Williams-Davis*, 90 F.3d 490, 494-99 (D.C. Cir. 1996), the court rejected *Remmer*'s automatic presumption, concluding that the district court instead should "inquire whether any particular intrusion showed enough of a likelihood of prejudice to justify assigning the government a burden of proving harmlessness." *Id*. at 497 (internal quotations omitted).[10]

We agree that the *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*. Accordingly, the trial court must first assess the severity of the suspected intrusion; only when the court determines that prejudice is likely should the government be required to prove its absence. This rule comports with our longstanding recognition of the trial court's considerable discretion in investigating and resolving charges of jury tampering.[11] As stated in *Olano*, 507 U.S. at 739, regardless of whether the presumption arises, the court's "ultimate inquiry" must be whether the intrusion will affect the jury's deliberations and verdict.

4.

In sum, although we reject the *Remmer* presumption, we agree

---

[10] Although we have addressed *Remmer* in several cases since *Olano* was decided, *see, e.g., Ramos*, 71 F.3d at 1154, we have yet to determine whether the presumption remains viable.

[11] *See, e.g., United States v. Ramos*, 71 F.3d 1150, 1153-54 (5th Cir. 1995) ("In granting a broad discretion to the trial judge, we acknowledge and underscore the obvious, that the trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence.").

24

with the appellants that the district court abused its discretion in conducting the *ex parte* voir dire. Accordingly, we retain jurisdiction and remand for the limited purpose of a hearing to determining whether the jury was prejudiced by the outside contacts.[12] *See Remmer*, 347 U.S. at 230; *Forrest*, 620 F.2d at 459. Counsel for both sides shall be given the opportunity to examine the jurors on the record, under oath. Subject to ultimate review by this court, if the district court concludes that the contacts did not result in prejudice, the convictions shall stand affirmed, and if the court concludes that the contacts did result in prejudice, the appellants are entitled to a new trial.

REMANDED.

---

[12] We remand Sylvester's case as well, even though he failed to raise the jury tampering issue in his brief. *See United States v. Miles*, 10 F.3d 1135, 1137 n.3 (5th Cir. 1993) (quoting *United States v. Gray*, 626 F.2d 494, 497 (5th Cir. 1980)):

> Ordinarily we would limit each defendant's appeal to the issues raised in his brief. However, we have discretion to suspend the Federal Rules of Appellate Procedure "for good cause shown," FED. R. APP. P. 2. Believing it anomalous to reverse some convictions and not others when all defendants suffer from the same error, we consider the arguments to be adopted. . . . This adoption does not prejudice the government which had the opportunity to fully brief all issues in response to the various contentions of the defendants. . . . This notwithstanding, we caution counsel to state specifically in the opening brief the issues raised on appeal; the failure to do so will usually result in our not considering them.

(Internal quotations omitted.)