REVISED - August 9, 1999

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 98-20438

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JORGE GUSTAVO MUNERA-URIBE; SAMUEL MORENO-RAMOS;
MELQUECEDEC HURTADO MORENO; CARLOS A. RODRIGUEZ-
ESTUPINAN; SAMUEL VALOIS, a/k/a GERALD EDWIN JAMES,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

August 5, 1999

Before SMITH, WIENER, and
BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

A jury found Jorge Munera-Uribe ("Munera"), Samuel Moreno-Ramos ("Ramos"), Melquecedec Moreno ("Moreno"), Carlos Rodriguez-Estupinan ("Rodriguez"), and Samuel Valois ("Valois") guilty of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841, and of conspiracy to do the same, in violation of 21 U.S.C. § 846. Defendants appeal their convictions and sentences on a variety of grounds, including sufficiency of the evidence, admissibility of the evidence, alleged government misconduct, and incorrect application of the sentencing guidelines. We

affirm.

## I.

On August 11, 1997, at the direction of Special Agent Michael Dubet of the DEA, confidential informant "Sonny" met with Rosina Vinulla Russo, a codefendant not party to this appeal, at a Benningan's Restaurant in Houston, Texas. The purpose of this meeting was to discuss the purchase of one kilogram of cocaine. It was agreed that Russo would sell Sonny the cocaine for $18,000. The transaction would take place on August 13 at the Westwood Mall.

On August 13, Dubet drove Sonny to the Westward Mall. A meeting was held in Russo's gold Acura sedan among Sonny, Russo, and Russo's boyfriend Valois. At this meeting, a follow-up meeting was arranged, to be held at a Bennigan's restaurant. Because of police presence, this follow-up meeting was moved to an adjacent Pappas Barbecue restaurant.

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

At Pappas, Dubet, acting undercover, met with Sonny, Russo, and Valois. A codefendant not party to this suit took Dubet into the restroom and showed him the kilogram of cocaine that was for sale. Saying he did not presently have enough money on him, Dubet postponed the transaction's culmination, and the parties dispersed.

Shortly thereafter, Sonny called Valois, indicating that he had the money. He met Valois in the Pappas parking lot. This time, Valois was the passenger of a silver Ford Taurus, which was being driven by his brother, Juan Valois.[1] In return for the money, Sonny received one kilogram of cocaine. Juan Valois left the scene in his Taurus, Samuel Valois in the Acura.

Deputy Sheriff William Tipps followed the Taurus to an apartment complex at 4545 Cook Road, where Juan Valois left the car and entered apartment 712. Tipps kept an eye on the apartment throughout the day. Eventually, he saw Samuel and Juan Valois leave the apartment complex together in the Taurus. They drove to a Fiesta Food Mart, where they met with Ramos. After a ten-minute conversation, they shook hands and departed their separate ways.

In September, Dubet directed Sonny to contact Russo to set up another cocaine purchase. Sonny and Russo arranged to meet on September 18 at Houston's Restaurant to discuss the potential drug transaction. Sonny arrived at the restaurant first, followed by Valois and Russo. Russo and Valois agreed to sell Sonny seven kilograms of cocaine for $119,000. After Sonny had shown Russo the money, he was told that he would receive a phone call from them later in the day with details on how to complete the transaction. This subsequent phone call informed Sonny that the drug transaction would be completed at an Academy Sporting Goods store.

When Russo and Valois had left Houston's Restaurant (in the Acura), surveillance units followed them to Barney's Billiards, where Russo was dropped off. Valois continued on to the Hong Kong Food Market.

There, Officer Craig Thomas of the sheriff's department saw a black Isuzu Rodeo pull up to the Acura. The driver of the Rodeo was a Hispanic male who appeared to be in his mid-thirties (later identified as Juan Hernandez-Colon ("Hernandez"), a defendant not party to this appeal). The passenger of the Rodeo, Ramos, left the Rodeo and entered the Acura, carrying a blue gym bag with him, later found to contain five kilograms of cocaine. The Rodeo and the Acura then went their separate ways from the parking lot.

The Acura was followed back to Barney's Billiards, where Ramos left the vehicle and was replaced by Russo. At a Southwestern Bell Telephone training center, Russo exited the Acura and entered a van, which went to the Academy parking lot, to meet with Sonny to complete the drug transaction arranged earlier in the day. Valois remained in the Acura and followed Russo to Academy. On arriving there, they were arrested.

A search of the Acura revealed two blue gym bags in the trunk: one containing five kilograms of cocaine, another containing two. After reading them their rights in Spanish, Dubet interrogated Russo and Valois. He was told that two of the kilograms were from one source (a Colombian known as "Fecho," later identified as Moreno), and five from another ("Sammy" or "El Negro," later identified as Ramos).

Russo agreed to page Moreno and Ramos to her cellular phone and allowed agents to record the subsequent conversations. Russo told Moreno that she had his money and wanted to purchase an additional four kilograms of cocaine from him.[2] Moreno

---

[1] Juan Valois is not a party to this appeal. He will be referred to as "Juan Valois" throughout this opinion; appellant Samuel Valois will be referred to as "Samuel Valois" or simply as "Valois."

[2] As would be expected in a telephone conversation between drug traffickers, the word "cocaine" (continued...)

agreed to meet Russo at a Fiesta Supermarket to pick up his money. Moreno arrived at the Fiesta in a brown pickup truck. After he was identified by Russo, Moreno was arrested. His pager was seized, and it contained Russo's cell phone number.

When Ramos returned the page, Russo told him that his money (for the five kilograms of cocaine he had provided)[3] was available. Ramos too was told to meet Russo at the Fiesta to collect his money. When Ramos arrived at the Fiesta, he was identified by Russo and subsequently arrested. As with Moreno, Ramos's pager was found to contain Russo's phone number.

Meanwhile, Thomas had followed the Rodeo, seen driven by Hernandez, to an apartment complex at 8300 Sandspoint Drive. At the apartment parking lot, Thomas lost sight of Hernandez but did locate the Rodeo and surveyed it for approximately three hours until other law enforcement officers arrived.

Sometime after 9:00 p.m., when the other officers arrived, Thomas observed a Hispanic male (later confirmed to be Hernandez) descend the stairs of the apartment complex from a second floor landing. As Hernandez passed the officers, greetings were exchanged in English. When Hernandez went to the Rodeo and unlocked its door, Thomas approached him and identified himself as a deputy sheriff. Thomas informed Hernandez that he had been seen present at a drug transaction earlier in the day and was therefore suspected of drug trafficking. Hernandez was read his rights, and Hernandez acknowledged them in English.

After some initial denials, Hernandez confessed to his involvement in the drug deal. He told the officers that he had delivered drugs for his friends "Carlos" and "Jorge," who lived

in the apartment complex. He then pointed to the second floor landing, from which he had descended, as the location of their apartment.

---

(...continued)
was never explicitly used by either Russo or Moreno.

[3] Again, the word "cocaine" was never used.

While Hernandez was still being questioned, DEA Agent Marty Fanning observed another Hispanic male (later identified as Munera) descend the same stairs as Hernandez had. They noticed Munera make eye contact with the handcuffed Hernandez and saw him become visibly nervous. They also noticed that Munera was speaking on a cellular phone as he passed by, in English. Fanning asked Hernandez whether Munera was one of his two friends; Hernandez replied "no."

Nevertheless, Fanning approached Munera and asked whether his name was "Jorge." Munera replied "no" and told Fanning that his name was "Gustavo." When asked for identification, Munera produced a driver's license with the name "Jorge Gustavo Munera-Uribe." When asked why he had lied, Munera looked down at the ground and proclaimed "no hablo ingles." This despite the fact that all prior communications between the DEA and Munera had been in English, along with Munera's conversation on his telephone.

A pat down of Munera revealed a pager and two cellular phones. At that point, Munera was handcuffed and informed that "he was being detained for narcotics investigation."

To determine the apartment from which Munera and Hernandez had come, Fanning asked Munera "which apartment his friend was in." Munera again responded: "no hablo ingles." Fanning pressed Munera to show the officers his friend's apartment, and he nodded his head approvingly. He took them to the second floor landing from which he and Hernandez had descended.

Once there, the officers were presented with a choice of two apartments to search: apartments 1714 and 1716. Munera indicated (by pointing with his nose) that apartment 1716 was the apartment of his friends. The agents knocked on that door, but no one answered. They opened the door via a key they had found on Munera. No one was in the apartment. Subsequent investigation would reveal that this same key opened the door to apartment 1714 as well.

Thomas noticed that the lights were on in apartment 1714. Peering into its window, he saw a man seated on a couch (later identified to be Carlos Rodriguez). When the officers knocked on the door, Rodriguez jumped up and ran out of view. A woman, Ms. Hurtado, opened the door, and the officers identified themselves. When asked whether anyone else was inside the apartment, Hurtado said "no," immediately heightening the suspicions of the officers. The government contends that the officers then asked for and received permission (from Hurtado) to go inside the apartment and have a look around.

The officers entered with weapons drawn and "announced" their presence. Not receiving any response, they began to "clear" the apartment, searching rooms, hallways, and closets for hidden persons.

In one closet, an officer noticed a clear bag on a shelf containing what appeared to be cocaine, and a gym bag on the floor. The officer made a mental note of this observation and proceeded with his search. Upon coming to the apartment's bedroom, the officers found Rodriguez hiding under a bed.

The officers seized Rodriguez and returned him to the living room. Thereafter, they asked for and received permission (from Hurtado) to conduct a more thorough search, during which they retrieved the clear plastic bag and duffle bag from the closetSSboth were found to contain several kilograms of cocaine.

A DEA agent fluent in Spanish was summoned to the scene. He advised Hernandez, the first of the three Sandspoint defendants to be arrested, of his rights. Hernandez admitted his role in the cocaine conspiracy: He had helped a Colombian deliver cocaine in the Rodeo.

The same agent then advised Rodriguez and Munera of their rights. Both of them initially denied knowledge of the cocaine. The agent told Munera that things would be easier for him if he cooperated and told the truth. He

added that if Munera helped "bring in some other people," he might get a break. Munera continued, however, to deny everything. Munera and Rodriguez were taken to DEA headquarters for processing.

While there, Munera asked to speak to the DEA agent who had questioned him previously, because he "wanted to tell the truth." Munera confessed that he and Rodriguez had been paid by a Colombian to guard the cocaine in the apartment. Munera then offered to talk to Rodriguez and to convince him to confess. Munera did this, and Rodriguez finally admitted that he too had been paid to guard cocaine in apartment 1714.

## II.

Ramos, Moreno, and Rodriguez claim insufficient evidence to convict. If a rational jury could have found them guilty beyond a reasonable doubt based, then the evidence in question was sufficient. *United States v. Gourley*, 168 F.3d 165, 168 (5th Cir. 1999). In undertaking this analysis, we view the evidence and all reasonable inferences therefrom in the light most favorable to the verdict. *Id.* at 168-69.

"There are three elements to possession with the intent to distribute cocaine base: (1) knowing (2) possession of the drugs in question (3) with intent to distribute them." *United States v. Suarez*, 155 F.3d 521, 524-25 (5th Cir. 1998). To affirm on this charge, we must find that the evidence was sufficient to show that each of these elements has been satisfied. *United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998).

For a conviction of conspiracy under § 846, the evidence must be sufficient show that (1) at least two people had an agreement to traffic in drugs; (2) the defendants were aware of this agreement; and (3) the defendants knowingly and voluntarily participated in the implementation of this agreement. *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998). Mere presence at a crime scene, or close association with conspirators, standing alone, cannot rise to knowing participation in a conspiracy as a matter of law. *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992).

Because defendants do not challenge the existence of an agreement, a finding that the evidence was sufficient to convict of possession of cocaine with intent to distribute goes a long way in affirming the conspiracy convictions: A guilty state of mind, combined with incriminating activity on the cocaine distribution charge, proxies for the knowing and voluntary participation element of the conspiracy charge. Thus, if the substantive charge of possession with intent to distribute cocaine survives challenge, the defendants can escape a conspiracy conviction only if they are able to demonstrate that they thought they acted alone, pursuant to no particular agreement with anyone else.

### A.

The evidence was easily sufficient to support Ramos's convictions. He was the one who placed in Valois's Acura the blue sports bag later found to contain five kilograms cocaine. Although there was no direct proof that Ramos knew cocaine was in the bag, such an inference is reasonably drawn, especially in light of the large quantity of cocaine in question.

Additionally, Ramos responded to a page from codefendant Russo telling him to meet her to pick up his portion of the proceeds from the sale of his cocaine. Of course, as would be expected in a transaction among drug dealers, the word "cocaine" was never explicitly used, but Russo explained to the police that cocaine was the subject of the call. The jury had before it only the transcript of this phone call and evidence regarding its context (namely, that the call was made by Russo for the purpose of telling Ramos that his proceeds from that day's cocaine deal were available). Under these circumstances, the jury had no reason to believe that the call concerned anything other than cocaine.

Lastly, Ramos was seen cavorting with Valois. This constitutes further evidence that Ramos and Valois were drug-dealing partners, adding to the reasonableness of the jury's verdict of guilty.

Ramos unsuccessfully attempts to compare his situation to that in *United States v. Sacerio*, 952 F.2d 860 (5th Cir. 1992), in which we held that two defendants associated with a automobile containing cocaine could not be considered drug dealing coconspirators. *See id.* at 864. But in *Sacerio,* police officers needed to conduct *three searches* of the vehicle in question before they were able to find the cocaine. *Id.* During one such search, rather than appear nervous or concerned, one defendant actually fell asleep. *Id.* Given that there was scant reason to believe that defendants in *Sacerio* knew that there were drugs in their car, we could not find that their behavior (namely, driving an automobile that happened to contain a hidden stash of cocaine) constituted knowing participation in a drug conspiracy. *Id.*

The instant case is different. Ramos personally carried a bag containing several kilograms of cocaine from one car to another. While not everyone can be expected to know everything that is hidden in a car he happens to be driving, it is reasonable to expect an individual to know the contents of a gym bag he is carryingSSespecially when it is weighed down by several pounds of contraband..

### B.

Although admittedly creating a closer case, the evidence is sufficient to sustain the verdicts against Moreno as well. The government's main evidence against Moreno is the fact that he too responded to Russo's page regarding the pick up of drug money. The ensuing telephone conversation between Moreno and Russo was, however, more incriminating than that between Ramos and Russo, for Moreno's phone call discussed the possibility of providing additional amounts of cocaine for sale. Moreno indicated to Russo that he could not provide any more cocaine until he received his money from the day's earlier transaction. Again, the transcript of this call is devoid of any specific mention of cocaine by name, but it does constitute quite damning evidence in light of Russo's characterization of the purpose of the call. The transcript of this recorded conversation, in conjunction with its attendant circumstances, is by itself sufficient to support the jury's verdicts against Moreno beyond a reasonable doubt.

## C.

The evidence is sufficient to sustain the verdict rendered against Rodriguez. He was found in one of the two apartments from which Munera and Hernandez had exited. When police knocked on the apartment door, Rodriguez ran from view and hid under a bed. The apartment in question contained over eleven kilograms of cocaine, and eventually, Rodriguez admitted that he had been paid to guard it. All of this is sufficient to establish Rodriguez's guilt in the substantive offense and in the conspiracy beyond a reasonable doubt.

## III.

Rodriguez and Munera claim a long list of Fourth and Fifth Amendment violations. We review the district court's findings of fact on these issues for clear error and its interpretation and application of law *de novo*. *United States v. Carrillo-Morales*, 27 F.3d 1054, 1060 (5th Cir. 1994).

## A.

Munera claims that his arrest at the Sandspoint apartment parking lot was unconstitutional because it lacked probable cause. Absent an exception, the fruits of an arrest lacking probable cause must be suppressed, which in this case would include Munera's statements, the personal property found on him (the telephones, pager, and keys to apartments 1714 and 1716), and arguably even the cocaine seized in apartment 1714 (to the extent Munera can show that it would not have been uncovered but for his purportedly illegal arrest). *United States v. Webster*, 162 F.3d 308, 324 (5th Cir. 1998), *petition for cert. filed* (U.S. Apr. 29, 1999) (No. 98-9212).

Probable cause exists if "the totality of facts and circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Ho*, 94 F.3d 932, 935-36 (5th Cir. 1996). Additionally, imputed to the arresting officer's knowledge are all the facts and circumstances known to all law enforcement officials.

*Webster,* 162 F.3d at 331.

The following were the facts and circumstances of Munera's arrest: The police had just followed the Rodeo, involved in a drug transaction, to an apartment complex. The driverSSHernandezSShad just been arrested and had told police that he had been delivering drugs for his friends Carlos and Jorge, who lived in the complex. Hernandez pointed to a second-floor landing as the location of his friends' apartment. This landing was also the location whence Hernandez came prior to his arrest.

Munera was observed descending from the landing. Police watched him make eye contact with Hernandez, who was then in handcuffs, and thereafter become visibly nervous. Police asked Hernandez whether Munera was one of the friends he had spoken of; Hernandez answered in the negative.

When asked by Fanning whether his name was "Jorge," Munera replied "no." When asked to produce identification, Munera turned over his driver's license, which portrayed his name to be "Jorge Gustavo Munera-Uribe." When asked why he had lied, Munera proclaimed "no hablo ingles," despite the fact that all previous communication had been in English and that police had overheard Munera speaking in English on a cellular phone as he passed them by. A pat down of Munera revealed a pager and a second cellular phone. Pagers and cell phones have been held by other circuits to constitute tools of the drug trade. *United States v. Cleveland*, 106 F.3d 1056, 1061 (1st Cir. 1997); *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995). Under these circumstances, the police had probable cause to believe that Munera was involved in the drug conspiracy with Hernandez, and thus their arrest of Munera at that point was entirely lawful.

## B.

Regardless of the lawfulness of his arrest, Munera asserts that the "statement" he made to police at the Sandspoint apartment should have been suppressed. It is undisputed that Munera was not informed of his rights under

*Miranda v. Arizona*, 384 U.S. 436 (1966), until well after the search of apartment 1714. Nevertheless, the police asked him to show them where his "'friends'" apartment was, prompting Munera to lead the officers to the second floor landing, and thereafter pointing with his nose to apartment 1716.

Munera is correct in noting that his gestures constitute "statements" for *Miranda* purposes. *See United States v. Doe*, 465 U.S. 605, 612 (1984); *Fisher v. United States,* 425 U.S. 391, 410 (1976). There are at least two reasons, however, why the acquisition of these statements in the absence of *Miranda* warnings does not undermine the jury's verdicts against Munera.

Firstly, as the government notes, any *Miranda* error is harmless in that the evidence gathered therefrom was not necessary to finding Munera guilty beyond a reasonable doubt. *See United States v. Paul*, 142 F.3d 836, 843 (5th Cir. 1998). In addition to the circumstances of his arrest (his recognition of Hernandez, his lying about his name, his lying about his ability to speak English, and his possession of instrumentalities of the drug trade), there is Munera's subsequent confession, made after he had been read his rights.

Additionally, the "fruits" of his purportedly unlawfully acquired statement would have been inevitably discovered by the police anyway: The officers were already aware of the landing from which Munera had descended, and they would most likely have searched apartment 1714 regardless of Munera's gestures (which were misleadingly directed toward apartment 1716). *See Nix v. Williams*, 467 U.S. 431, 448 (1983); *United States v. Lamas,* 930 F.2d 1099, 1102 (5th Cir. 1991).

Secondly, police may dispense with *Miranda* warnings when necessary for their protection. *New York v. Quarles*, 467 U.S. 649, 655 (1984); *Webster*, 162 F.3d at 332. The dangers that law enforcement officials face from drug dealers and the like are well known, and it was important for the officers to identify precisely the apartment in which Munera's cohorts could be found.[4] The facts of the instant case call for the application of this "safety exception" to *Miranda,* and thus it is of no consequence that the officers failed to apprise Munera of his rights.

C.

---

[4] As mentioned, in this case, Munera originally led police to the wrong apartment number. This could have had disastrous consequences for the officers, should criminal occupants of 1714 have decided to ambush the officers as they searched the wrong apartment. It was precisely to guard against such risks that the officers needed to know what room Munera's comrades were in.

Munera challenges the legality of the search of apartment 1714 on the ground that the officers lacked a warrant. *See United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993). We find the lack of a warrant unproblematic in this case, as it fits squarely within the well-established "exigent circumstances" exception to the warrant requirement.[5] *See Kirkpatrick v. Butler*, 870 F.2d 276, 281 (5th Cir. 1989).

Exigent circumstances justify an exception to the warrant requirement if officers have "cause to believe either that evidence in the house may be destroyed or removed, or that the lives of police officers or other persons may be endangered by persons inside of the house." *Kirkpatrick*, 870 F.2d at 281 (footnote omitted). Each of these exigencies was present.

Based on their surveillance and the confessions of Hernandez and Munera, the officers had strong reason to believe that drugs and drug dealers were located in either apartment 1714 or 1716. The officers testified that they "fear[ed] for their safety when Rodriguez bolted" from the living room, and they feared that "Rodriguez may have been armed or was trying to flee." Additionally, they feared that Rodriguez might be attempting to destroy evidence.

Moreover, whether exigent circumstances exist is a question of fact for the district court, whose findings we review for clear error. *Id.* Given that the officers needed to protect against both the destruction of contraband and potential harm to themselves, the court was not clearly erroneous in finding exigency.[6]

Exigent circumstances do not, however, enable the police to conduct a full-fledged search. Instead, they are permitted to conduct only a "protective sweep," limited to searching those areas where a suspect might be hiding. *See Kirkpatrick*, 870 F.2d at 282. The record reflects that this is exactly what they did.

Munera argues next that any exigency was created by the officers, and this precludes them from engaging in a warrantless search on this basis. In support of this, Munera refers us to *United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993). The facts of *Richard* do parallel, to some extent, those here: Police had announced their presence outside of an apartment door and thereafter feared what the apartment's occupants might be doing. *Id.* at 246-47, 248. We did not find police-created exigency as a matter of law in *Richard*, but rather we merely affirmed the finding of police-created exigency under the clear-error standard of review. *Id.* at 248-50.

In the instant case, the court held precisely the opposite, and did so without error in light of the particular facts and circumstances. Unlike the situation in *Richardson*, where "[t]he agents had secured [the room] from the outside, successfully and covertly," *id.* at 249, in this case the police were trying to figure out which of two apartments was the one

---

(...continued)

Rodriguez-Estupinan, who they believed was still in the apartment and could pose a threat to the officers' safety."

Rodriguez also asserts that a finding of exigency under these circumstances (that is, following the arrests of Munera and Hernandez) is incorrect as a matter of law, relying on *Maryland v. Buie*, 494 U.S. 325 (1990). Rodriguez misconstrues when the exigency attached: It did not attach when the arrests of Munera and Hernandez were made, but rather when officers witnessed Rodriguez flee from the living room. Had Rodriguez not fled, but instead remained in plain view, and if the officers had secured apartment 1714, then a warrantless arrest (absent consent) might have been inappropriate. But those are not the facts of this case.

---

[5] Although there is evidence that Hurtado may have consented to the initial search of apartment 1714, we decline to resolve this issue on such a disputed factual ground.

[6] Rodriguez asserts that the district court did not make a factual finding of exigency. This contention is incorrect, as the district court explicitly noted that "[t]he officers engaged in a proper protective sweep to look for and to locate (continued...)

containing contraband and coconspirators.

Additionally, we have no evidence regarding how well secured the apartments were or what their means of ingress and egress were. Further still, the events of *Richardson* transpired in the morning, whereas the events of the matter before us transpired in the more treacherous setting of nighttime. Lastly, in *Richardson* the police at least knew that the apartment's occupants were not attempting to flee, *id.*; in the case before us, the police witnessed Hernandez's attempted escape. Thus, if the creation of exigency can be attributed to any particular person, responsibility would lie with Rodriguez, whose suspicious act of bolting from view alarmed the officers. In sum, the district court did not commit clear error in reaching its determination that exigent circumstances justified the warrantless search of apartment 1714.

D.

Rodriguez independently challenges the seizure of a clear plastic bag containing cocaine found in the closet of apartment 1714. He rejects the government's assertion of the doctrine of "plain view," arguing that Thomas, who came upon the cocaine, "could not be sure that the white powder residue found was cocaine." Rodriguez cites *United States v. Buchanan,* 70 F.3d 818, 826 n.6 (5th Cir. 1995), in which we noted that "the mere presence of white powder residue in a plastic bag, by itself, will [not] always give rise to probable cause."

The white powder was easily in Thomas's plain view; the only question is whether he had probable cause to believe that it constituted cocaine. *See id.* at 826. As we explained in *Buchanan,* whether such probable cause exists depends on the "totality of the circumstances." *Id.* This was not a case of the "mere presence of white powder in a plastic bag, by itself," *id.,* but rather of white powder found in an apartment already suspected of containing drugs and under suspicious circumstances (namely, Rodriguez's flight and Hurtado's deception). For these reasons, Thomas had probable cause to believe that the white

powder was indeed cocaine.

Secondly, the doctrine of inevitable discovery dispenses with Rodriguez's argument in that the officers obtained voluntary consent to search the apartment (from Hurtado) following Rodriguez's arrest. *See Nix,* 467 U.S. at 448; *Lamas,* 930 F.2d at 1102. Thus, even if Thomas did not have probable cause to believe that the white powder was cocaine, he validly seized and examined it following his receipt of permission to search the apartment. *See United States v. Kirk*, 111 F.3d 390, 392 (5th Cir. 1997).

E.

Rodriguez denies that the officers received valid consent to search apartment 1714. Because the plain view doctrine allows the introduction into evidence of the cocaine in the clear plastic bag, the only evidence that could be excluded via this argument is the cocaine contained in the closet's gym bag.

As Rodriguez correctly explains, for consent to be valid, it must be freely and voluntarily given by someone with authority to consent. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Rodriguez concedes that the consent by Hurtado was given freely and voluntarily; his dispute is over whether she had authority to consent to a search of the apartment.

Hurtado identified herself as a resident of apartment 1714. Defendants have introduced no evidence challenging this. So, the officers came to the objectively reasonable conclusion that Hurtado had the authority to consent to a search. *See United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (per curiam) (en banc) (holding that "officers' belief that they had consent, in light of all the circumstances," comports with Fourth Amendment if "objectively reasonable").

The court did not commit clear error in ratifying the officers' conclusions. The extent of Hurtado's knowledge of Rodriguez's wrongdoingSSsomething Rodriguez considers important in ascertaining Hurtado's authority to consentSSis irrelevant to this inquiry. *See*

*id.*

### F.

Munera argues that the court erred in failing to suppress a statement he made to a DEA agent, because "no evidence was presented that defendant waived his *Miranda* warning at the time he was questioned and that he was not informed of his right to communicate with consular or diplomatic officers of his country as required by Vienna Convention treaty and INS regulation." It is black letter law that a defendant's waiver of his *Miranda* rights must be knowing, intelligent, and voluntary. *United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994). This is a question of fact for the district court that we review for clear error. *Id.* at 99. Government witnesses testified that (1) Munera was read his rights, in Spanish, and (2) Munera affirmatively requested to make a statement to the DEA and was permitted to do so. From this evidence, the district court could and did properly conclude that Munera's statements did not run afoul of *Miranda*.

Munera presses, however, that his *Miranda* warnings were not repeated at the DEA holdover jail cell where his confession was tendered. But because the DEA agents did not recommence questioning of Munera at the jail, a second set of warnings was not required; instead, Munera voluntarily initiated the telling of his story. *See Moore v. Dugger*, 856 F.2d 129, 133 (11th Cir. 1988).

Munera's Vienna Convention argument is meritless in light of existing precedent. Although his rights under the Convention may have been violated, he has not adequately explained how this may have prejudiced his defenseSSa critical predicate were we to fashion a remedy for him under the Convention.[7] We accordingly reject this

argument.

### IV.

Munera contends that Fanning perjured himself on the stand and that the government knowingly sponsored this perjury. If true, such a finding on our part would merit a reversal of Munera's conviction. Munera carries the burden of proof on this tall accusation. *See United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989).

To prevail, Munera must demonstrate that (1) Fanning's testimony was actually false, *id.* at 822; and (2) that the government "knowingly sponsored" it, *United States v. Harrison*, 103 F.3d 986, 989 (D.C. Cir. 1997). Inconsistent testimony, by itself, does not meet this burden. *See United States v. Bortnovsky*, 879 F.2d 30, 33 (2d Cir. 1989).

According to Munera, at the suppression hearing Fanning testified that he knew to head for apartment 1714, because "Officer Thomas had watched Jorge Munera-Uribe walk from his apartment complex, from the door, the 1714." When pressed with the question "Is it possible that you saw him come from the landing where there were two apartments 1714 and 1716?", Fanning responded: "It is possible." He then elaborated, stating:

> We did not know the apartment doorSSI must correct myself. Officer Thomas said he saw some, the landing up there, that we wereSSthat's when we, that was the reason for taking Jorge Munera-Uribe up to the landing, is for him to knock on the door or show us the door that his friend was in, Carlos.

When asked whether Munera did indeed show him the door he had come out of, Fanning testified: "No, he didn't."

---

[7] *See Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir. 1996); *United States v. Lombera-Camorlinga*, 170 F.3d 1241, 1244 (9th Cir. 1999) ("Upon a showing that the Vienna Convention was violated by a failure to inform the alien of his right (continued...)

---

(...continued)
to contact his consulate, the defendant in a criminal proceeding has the initial burden of producing evidence showing prejudice from the violation of the Convention.").

At trial, Fanning testified that "to determine what apartment these two individuals [Munera and Hernandez] had come from . . . [he] asked Mr. Munera-Uribe which apartment his friend was in." Fanning continued, explaining that Munera pointed to apartment 1716 for them.

Contrary to Munera's characterization, Fanning's suppression hearing and trial testimony are not "in direct conflict." Munera blazons the fact that in his suppression hearing testimony, Fanning failed to mention that Munera gestured toward the landing for the officersSSindicating the apartment from which he came. But Fanning was never specifically asked that and was available to Munera's attorney for cross-examination. Instead, Fanning was asked whether Munera accurately identified apartment 1714 for himSSMunera did not (instead motioning with his nose to apartment 1716), and Fanning testified as such.

At trial, Fanning reiterated that he turned to Munera for help in locating the correct apartment, and that Munera pointed the officers toward apartment 1716. This hardly constitutes perjury: Fanning's testimony at the suppression hearing was at most incompleteSSit did not, however, contradict anything he later told the court.

Secondly, even if Fanning can be said to have perjured himself, Munera has brought nothing to our attention purporting to show that the government sanctioned such testimony, the second vital element of his claim. For these reasons, there was no error

V.

According to Rodriguez, the federal prosecutor made improper comments at closing that deprived him of a fair trial. Rodriguez bears the burden of establishing that these comments did in fact deprive him of a fair trial. *United States v. Bermea*, 30 F.3d 1539, 1562 (5th Cir. 1994). In determining whether he was deprived of a fair trial, we consider whether the comments, taken as a whole within the context of the trial, prejudicially affected substantive rights. *United States v. Rasco*, 123 F.3d 222, 229

(5th Cir. 1997). The offending comments were as follows:

1. "Mr. Ash [Rodriguez's attorney] would have you think that the Gestapo had showed up at the door to 1714 at 8300 Sandspoint, that it was this massive show of force that caused poor [Rodriguez] to jump from the couch, run to the back of the apartment, hide under a mattress."

2. "If you recall the testimony, [Rodriguez] was gone on the knock."

3. "[T]he officers and agents had no reason to get on the stand here and lie to you."

None of this deprived Rodriguez of a fair trial.

The first comment accurately captured Rodriguez's theory of the case: He had argued that the presence of a large force of armed police officers gathered on his balcony alarmed him and caused him to flee. To characterize the image conjured up by Rodriguez's explanation as a "gestapo" force is not extraordinary. We do not find the word "gestapo" to be so inflammatory as to destroy the fairness of a trial. In fact, the term has taken on a generic meaning in modern usage and no longer refers solely to the secret police of Nazi Germany. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 952 (1986).

The second comment is also an accurate portrayal of events: Rodriguez indeed fled after the officers knocked on his door. Although use of the expression "gone on the knock" does not exactly help Rodriguez's cause, it is well within the prosecutor's prerogative to use such expressions in his role as an advocate. The prosecutor need not avoid honest, truthful characterizations of the facts helpful to his argument.

Lastly, telling the jurors that "the officers and agents had no reason . . . to lie" does not constitute the impermissible use of a prosecutor's status to bolster the testimony of

a witness, but only presents a permissible summary of the evidence. Rodriguez suggested that the police were being untruthful in their testimony; the prosecutor could fairly respond to this suggestion by making note of the fact that there was nothing in the record supporting this accusation. *See United States v. Vaccaro*, 115 F.3d 1211, 1216 (5th Cir. 1997), *cert. denied,* 118 S. Ct. 689 (1998).

## VI.

Section 3B1.2 of the Sentencing Guidelines instructs the court to grant a downward adjustment for defendants whose roles in a criminal offense are "minor." Rodriguez and Ramos challenge the decision not to grant them such an adjustment. We review for clear error. *United States v. Valencia-Gonzalez*, 172 F.3d 344, 346 (5th Cir. 1999).

## A.

Rodriguez was responsible for "guarding 16.52 kilograms of cocaine (worth nearly $200,000)." Sentencing Proceedings at 8 (May 15, 1998). Such a large responsibility does not suggest a minor role. Indeed, under our precedent, a defendant whose role is "limited to holding or delivering drugs" is not ordinarily entitled to a minor role adjustment. *See United States v. Edwards*, 65 F.3d 430, 434 (5th Cir. 1995). Rodriguez has furnished us with no precedent suggesting that, under the facts of this case, we or any other circuit has held that a minor role adjustment is in order.

## B.

Ramos assisted in the delivery of cocaine on August 13 and September 18. On August 13, he was observed carrying a blue gym bag containing cocaine into Hernandez's car. Later that day, he came to Fiesta to collect money for the drugs he had provided. Again, given *Edwards*, we cannot say the court committed clear error by failing to afford Ramos minor role status in light of these facts. As with Rodriguez, Ramos supplies us with no countervailing caselaw suggesting that a minor role adjustment would be appropriate under these circumstances.

## VII.

Under the "safety valve" provision of the Sentencing Guidelines, a court must sentence defendants below statutory mandatory minimums (and in accord with the lower applicable Sentencing Guidelines range) if five conditions are met. U.S.S.G. § 5C1.2. Valois asserts that the court improperly denied him the benefit of this provision.

Valois bears the burden of establishing that all five conditions are met. *See United States v. Vasquez*, 161 F.3d 909, 912 (5th Cir. 1998). This is an issue of fact to be determined by the court. *United States v. Torres*, 114 F.3d 520, 527 (5th Cir.), *cert. denied*, 118 S. Ct. 316 (1997). Accordingly, we review for clear error. *United States v. Wilson*, 105 F.3d 219, 222 (5th Cir. 1997).

Only satisfaction of the fifth condition is before us, with the government apparently conceding that the other four have been met. The fifth condition requires that "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2.

According to the government, Valois had (1) failed to admit that he accompanied Russo on the August 13 cocaine pickup; (2) lied about the delivery of drug proceeds to Ramos later that day; and (3) denied being with Russo when she met Moreno on September 18 to obtain two of the seven kilograms involved in

that day's transaction. Valois counters by arguing that he recited all the facts he knew to the best of his recollection. He adds that none of the government's examples of untruthfulness is "specific enough to determine, even by a preponderance of the evidence, that Valois was not being honest . . . ."

As a matter of law, Valois argues, he cannot be denied relief under § 5C1.2, because "the record does not contain specific findings of, or support for, the government's allegations of untruthfulness." In support of this proposition, he refers us to *United States v. Miranda-Santiago*, 96 F.3d 517, 527-30 (1st Cir. 1996).

*Miranda-Santiago* does not support Valois's position. There, the government proffered no direct evidence tending to show that the defendant in question was being deceitful. *Id.* at 529. Instead, the government asserted that the defendant must have known more than he was revealing in light of the fact that he "shared living quarters with other codefendants." *Id.* Such "mere conjecture" cannot be the basis for denying the benefit of § 5C1.2. *Id.*

In Valois's case, the government did not offer up "mere conjecture," but concrete evidence tending to show Valois's untruthfulness (such as statements from Valois's codefendants). The court held a hearing on the matter specifically and came to the conclusionSSafter considering all the evidenceSSthat Valois was being untruthful. Thus, the court did not engage in "speculation" or "mere conjecture" in concluding that Valois was undeserving of § 5C1.2. *Id.* More importantly, the court did not commit clear error in sentencing Valois, for Valois failed to carry his burden and demonstrate the applicability of § 5C1.1 in light of the government's countervailing evidence.

## VIII.

Moreno complains that the court improperly denied him a decrease in his sentence for acceptance of responsibility.

Section 3E1.1(a) of the Sentencing Guidelines instructs a court to decrease a defendant's offense level by two if "the Defendant clearly demonstrates acceptance of responsibility for his offense." Moreno bears the burden of establishing acceptance of responsibility. *United States v. Thomas,* 120 F.3d 564, 575 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 721 (1998). Our standard of review on this issue is "more deferential than that of clear error." *Id.*

Although he participated in the same defense as did his codefendants, Moreno argues that he is entitled to the two-level reduction of § 3E1.1 because "he did not testify at trial nor did he deny the allegations of the indictment during the trial." Moreno attempts to fit his litigation strategy into the narrow exception to § 3E1.1 recognized for those defendants who raise solely legal defenses. *See* U.S.S.G. § 3E1.1, comment.

The court did not err in holding that Moreno has failed to carry his burden of proof on this issue: There is absolutely no evidence in the record indicating acceptance of responsibility on the part of Moreno, who had an opportunity to present such evidence pretrial but passed it up, failing to distinguish himself from his codefendants' full-fledged defense. *See Thomas*, 120 F.3d at 575. So, Moreno cannot avail himself of § 3E1.1. *Id.*

## IX.

Ramos and Rodriguez challenge the calculations regarding the amount of cocaine for which they were individually responsible. These calculations are important, because the base offense level (and thus the length of imprisonment) for non-violent drug offenders is set in accordance with the quantity of drugs involved. *See United States v. Brito*, 136 F.3d 397, 415 (5th Cir.), *cert. denied*, 118 S. Ct. 1817 (1998); U.S.S.G. § 2D1.1(c). We review for clear error. *Brito*, 136 F.3d at 415.

"For a defendant involved in a drug trafficking conspiracy, the quantity includes both the drugs with which the defendant was directly involved and the drugs that can be attributable to him through the conspiracy."

*Id.*

> The defendant will not necessarily be held responsible for the full amount of drugs involved in the conspiracy, rather the defendant will only be held accountable for those amounts of drugs that he knew or reasonably could have known or believed were involved in the conspiracy. In order to calculate this amount, a court may consider the co-conspirator's role in the conspiracy, his relationship to the other conspirators, and any other information with "sufficient indicia of reliability."

*Id.* (citations omitted).

The court felt that it had sufficiently reliable information tying Ramos and Rodriguez to more than fifteen kilograms of cocaine each and based the sentence on that quantity. Our review of the record reveals no error.

Ramos disputes the attribution to him of five kilograms of cocaine from the September 18 transaction and one kilogram from the August 13 transaction. With regard to the five kilograms, the government introduced statements from Hernandez in which Hernandez claims that Ramos asked him for a ride to the gas station so he could deliver the five kilograms. Hernandez also stated that he helped Ramos put the five kilograms into a bag and thereafter did indeed drive Ramos to the gas station. The court could—and did—properly base its determination on this uncontradicted evidence.[8]

Rodriguez disputes the attribution to him of five kilograms of cocaine from the September 18 transaction. The government introduced circumstantial evidence linking him to these drugs: Hernandez testified that he obtained the five kilograms from the Sandspoint apartment, and Rodriguez admitted to guarding the cocaine stored there. Putting these two facts together, the court could—and did—reasonably conclude that Rodriguez should have known about this quantity of drugs. The court did not commit clear error in attributing them to Rodriguez for sentencing purposes.

AFFIRMED.

---

[8] As to the one kilogram of cocaine from August 13, the agents seemed to testify in conclusional fashion that the cocaine came from Ramos. Such testimony is not specific enough to contain "sufficient indicia of reliability." *Id.* The only thing in the record to bolster this assertion is the ten-minute evening encounter between Ramos and the Valois brothers. Although the one-kilogram cocaine transaction of earlier that day may very well have been the subject matter of this meeting, the court could not properly come to such a conclusion based on this meager evidence alone. Thus, the court should have found Ramos responsible for sixteen kilograms of cocaine, not seventeen. This does not affect the sentence, however, because the relevant threshold is fifteen kilograms.